IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT IN AND FOR
OSCEOLA AND ORLANDO COUNTIES,
FLORIDA

GENERAL JURISDICTION DIVISION

| | |
|---|---|
| JULIAN M. IGNATOWSKI, SR., an individual<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN SIGN LANGUAGE SERVICES CORP., a Florida For Profit Corporation, AMERICAN SIGN LANGUAGE ENTERPRISES, LLC, a Florida Limited Liability Company, ASL SERVICES HOLDINGS, LLC, a Florida Limited Liability Company, GLOBALVRS, LLC, a Florida Limited Liability Company, and ANGELA M. ROTH, Individually.<br><br>Defendants. | Case No.:<br><br>2021 JAN 20 AM 8:59<br>CIRCUIT COURT<br>DISTRICT OF FLORIDA<br>ORLANDO, FLORIDA<br><br>FILED |

## COMPLAINT FOR DAMAGES

1. PLAINTIFF, JULIAN M. IGNATOWSKI, SR., ("Plaintiff") appearing *pro se*, brings this Complaint for Damages against DEFENDANTS, AMERICAN SIGN LANGUAGE SERVICES CORP., a Florida for Profit Corporation, ("ASL Services"), AMERICAN SIGN LANGUAGE ENTERPRISES, LLC, a Florida Limited Liability Company, ("ASL Ent."), ASL SERVICES HOLDINGS, LLC, a Florida Limited Liability Company, ("ASL Holdings"), GLOBALVRS, LLC, a Florida Limited Liability Company, ("GlobalVRS"), and ANGELA M. ROTH, an individual ("Roth"), (ASL Services, together with ASL Ent., ASL Holdings, GlobalVRS, and Roth, the Defendants), and alleges as follows:

## STATEMENT OF JURISDICTION

2. Jurisdiction in this Court is proper because:

   -This is an action for damages that does exceed $30,000.

   -The events giving rise to this Complaint occurred in Osceola County and the Defendants reside in both Osceola and Orange Counties.

   -The Plaintiff's address is 52 Riley Road, #196, Celebration, FL 34747.

   -The Defendant's address is 3700 Commerce Blvd., Suite 216, Kissimmee, FL 34741.

## FACTS ALLEGED

3. In March of 2012, the Plaintiff was hired by the Defendants to be a short-term accountant to cover the various accounting tasks of the accounting team while they took their vacation time. During this time the existing Accounting Manager, quit her position without notice and recognizing the Plaintiff's skillset, business acumen, and professionalism, the Defendants promoted the Plaintiff to Accounting Manager within his first 90 days of employment. The Plaintiff was later promoted to Finance Director, then CFO of the Defendants' business organization, each promotion carrying with it increases in salary and/or benefits. Although compensation was fair for the Plaintiff's role at the Defendants' business organization, the impact of an extremely hostile work environment began to take its toll on the Plaintiff.

4. The Defendant Roth ran her organization with the self-proclaimed narcissistic title of "benevolent dictator", but there was more dictatorship and less benevolence in her approach to running her companies. Whenever the Plaintiff would advise her to not take a specific course of action which would financially harm her companies, Roth would argue with the Plaintiff, utilizing vulgar language, as well as psychologically and emotionally abuse the Plaintiff, as well as using his race, his age, his gender and his religion as a means to shame and humiliate him privately in their finance meetings as well as in front of other employees in the organization.

5. Although the Plaintiff had personally witnessed Roth treating many employees, clients, vendors and freelance interpreters in unprofessional, inappropriate and hostile ways, with threats and accusations, many times bringing others to the point of tears, Roth had not started to turn such abuses toward the Plaintiff until a couple years into his employ. And, the abusive behavior became more intense after the death of the Plaintiff's daughter in the Spring of 2015.

6. During 2015 and until June of 2016, when the Plaintiff resigned, Roth began making sexist and racist remarks to and about the Plaintiff. Whenever the Plaintiff would disagree with Roth's irresponsible business decisions, Roth would dismiss him with her go-to mantra, "Typical response from a white American male in his 40s." Roth made it clear to the Plaintiff that as a woman of color in business, that I represented all the men that Roth has had to battle throughout her career. Roth generalized and dismissed the Plaintiff consistently as one those men in that "camp".

7. The Defendants require all employees to undergo "diversity training". The Plaintiff was one of three white males who worked at the company's headquarters in Kissimmee, Florida. Roth taught the class that the Plaintiff was in. During the class, it became apparent that the course had nothing to do with diversity training, but everything to do with the hatred of white American males. The census of the organization at the time consisted of predominantly minority women. Roth used this opportunity to highlight and try to shame the Plaintiff for being in the targeted group of her hatred-white American males. Being the only white American male in the classroom of approximately ten other employees left the Plaintiff feeling targeted, ridiculed, harassed, bullied, shamed, demeaned, embarrassed, and belittled.

8. During a senior executive meeting, Roth laughed when the Plaintiff remarked that he was of Jewish decent and responded in front of the entire group, "that makes a lot of sense". When countered and asked what Roth meant by that, she responded, "you tend to be, what shall we say, cheap? Maybe frugal is a better word for it." She used an opportunity during an executive meeting to point out that because the Plaintiff is Jewish, he must be frugal.

9. Roth thought she was the resident psychiatrist of the Defendant's organization and would require employees she had problems with to read books she would assign them to read and provide a book report if they wanted to retain their job. Roth enjoyed psychologically and emotionally abusing her employees. Whether commenting on someone's weight, their religion, their age or their skin tone, she made sure that her tyrannical position went without any accountability. In a finance meeting, Roth had a note on her desk, "when meeting with Julian (Plaintiff), make sure to use scripture". In another finance meeting, when the Plaintiff did not agree with the Defendant taking out more shark loans to meet cash flow needs, Roth stopped the meeting, and began to ask very personal questions about the Plaintiff's home life, sex life and the grief of the loss of his daughter. Roth offered a book to the Plaintiff and, responded that his personal life was none of her business, nor did it have anything to do with her business' operations.

10. When the Plaintiff's teenage daughter was undergoing chemo-, radiation- and stem-cell therapies for her fight against brain cancer, the company never offered the Plaintiff FMLA, but just recommended that he make up any hours lost by working late and/or on weekends for appointments to care for the Plaintiff's daughter, although there are over 100 employees, and such a benefit should have been offered to him.

11. Because the Defendant's HR department filed paperwork incorrectly, the Plaintiff's daughter did not receive the full death life insurance benefit of $25,000 that should have been received.

12. Roth habitually adjusted her breasts in her bra in front of the Plaintiff during meetings. The Plaintiff thought this was disturbing for his employer to do such things in front of him, let alone that he was a married man and thought the practice violated business boundaries and contributed to an ever-increasing hostile work environment. Roth would also embrace the Plaintiff in familial hugs without first asking for his consent to do so. Whereas, whenever the Plaintiff would embrace a colleague, he would ask their permission prior to proceeding and not just assume others wanted to be held, hugged or embraced.

13. The majority of the employees at the corporate headquarters are attend the same congregation as Roth and were either fellow Jehovah's Witnesses as was Roth, or family members/friends of Roth. Roth allowed her fellow Jehovah's Witnesses to take off on or around national holidays, of which Jehovah's Witnesses do not celebrate, thereby not allowing those who do, such as the Plaintiff to secure that same time off.

14. When Roth's daughter, the COO, and her husband at the time, who also worked at the Company got reinstated into the Jehovah's Witness congregation for having an affair and divorcing their previous spouses, Roth allowed all the fellow Jehovah's Witnesses in the office to leave work and participate in the special event, leaving the very few of us to stay behind and work, rather than shutting down the office for the day. The same type of situation occurred each year during the Jehovah's Witnesses annual conferences, where the office was a ghost town for three to four days. Special allowances were afforded to Jehovah's Witnesses on personal time off requests that were not extended to the rest of the employees.

15. Roth allowed her companies to be a place that fostered racist, religious, and sexist jokes. Employees made jokes about Deaf individuals, without any punishment. Roth knew that her daughter, the COO of the company was having an affair with one of her subordinates, a Deaf male, and protected member, and allowed this behavior to continue for months and demoralize the entire corporate headquarters. Defendants created an environment which encouraged and fostered a hostile work environment for the Plaintiff due to his race, religion and gender. Such conduct was ongoing, open, and notorious. Simply put, these various types of discrimination are deeply embedded in the Defendants' organization. It is open, active, and unashamed. The harassment, abuse and discrimination are encouraged by the Defendant's management's refusal to stop the misbehavior.

16. When Roth's daughter, the COO, resigned Roth required the senior C-suite management team to be in an all day and all-night meeting, from approximately 7am to 7pm to figure out how the company would operate without her daughter at the helm of operations. At the end of the meeting, Roth turned to the Plaintiff in the presence of other managers and employees in the room and said to the Plaintiff, who had just lost his daughter to cancer, "Now I know what it feels like to lose a daughter."

17. Roth required that the Plaintiff attend an out-of-state business trip with her daughter-the COO and the Deaf male executive she was openly having an affair with so that the Plaintiff could "be there to babysit and make sure they don't ruin the business presentation and ultimately lose a massive nationwide client." When the Plaintiff stated he didn't feel comfortable in that role and the trip would be on his wife's birthday, her first birthday since the death of their daughter," Roth's response was, "I need you to do this and you can just celebrate her birthday when you get back."

18. Roth called the Plaintiff at all hours of the night, on weekends, during personal time off, vacations, etc. and didn't honor any normal work-home-life balance boundaries. During the Plaintiff's last family trip prior to the Plaintiff's death, Roth demanded that the Plaintiff work on several large projects which took his attention and time away from his family for approximately 25 hours during that weeklong getaway. When the Plaintiff questioned why she had done this to him and his family, her response was, "I'll tell HR to put the time back into your PTO bank." But the point was she had taken valuable time away from his family with a daughter who was dying.

19. After Roth's daughter who was the acting COO resigned, the Plaintiff thought the workplace would get better, instead it became even more so toxic and cruel, so the Plaintiff resigned in June of 2016. Roth begged the Plaintiff not to leave, and when he said there was nothing that she could do or say to retain his employ, Roth went from crying to screaming, "Fine! If that's how you want it, then that's how it's going to be!" and then left his office slamming the door.

20. The Plaintiff left with the Defendant owing him more than $30,000 in unpaid wages which still have not been paid, a copy of which is attached hereto as Exhibit "A".

21. The Plaintiff sent several demand letters for payment, which went ignored, a copy of which is attached hereto as Exhibit "B".

22. The Defendant began to spread rumors defaming the Plaintiff stating he had been fired and had stolen monies from the company. Additionally, Roth sent out an email blast to vendors, freelance interpreters, clients, and staff of the Defendants' warning them of the new employer that I started working with, a copy of which is attached hereto as Exhibit "C".

23. Interpreters in the community were afraid to speak with the Plaintiff or have anything to do with him because Roth had threatened that they would be fired.

24. The Defendant has a colorful history of litigation and unethical, toxic workplace environment. In just the few years that the Plaintiff was employed by the Defendants, the Plaintiff saw more than 50 independent contractors stop working for the Defendant and countless employees for how they were treated.

25. In 2016, the Defendant had legal action brought against them by a Deaf employee, who alleged unlawful termination. The Defendants decided to settle out of court as they were afraid that if the public found out that a Deaf employee was suing a sign language interpretation company that it could damage the remains of any reputation in the community they service. The Defendants ended up settling this claim by paying the Deaf employee six months of salary.

26. In July of 2018, the Defendant had legal action brought against it and its Human Resources department for violation of federal law by firing an employee who was on approved FMLA leave.

27. That same employee then sued the Defendant via the EEOC for retaliation.

28. When a Caucasian Deaf male employee resigned from the Defendant's company, he cited acts of racist behavior towards himself/others in the company in his exit interview, which was provided to me upon his departure, a copy of which is attached hereto as Exhibit "D".

29. The Defendants are liable under Title VII for such harassment and discrimination because it knew, or should have known, of the racial harassment and other forms of discrimination, but failed to take prompt and effective remedial action. Instead, it did just the opposite. It condoned, ratified and otherwise allowed the racially harassing and other discriminatory behavior to continue. Racial slurs were used during the Plaintiff's tenure at the Defendants' organization.

30. After numerous interpreters informed the Plaintiff of the vicious rumors and defaming false statements that were being made about him, he filed a Cease and Desist order, which Roth ignored. In response, Roth issued a Restraining Order through the Osceola County Sheriff's Office against the Plaintiff, calling him a mentally-unstable man in crisis who was a physical threat to her. This was Roth's claim, even though the Plaintiff had not gone back to the Defendant's organization since his resignation, nor had he ever threatened any harm to her, a copy of which is attached hereto as Exhibit "E".

31. On December 29, 2017, the Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging racial, religious, gender, sex, age, nationality, and hostile work environment discrimination against his former employer, the Defendants, a copy of which is attached hereto as Exhibit "F". Several months later the Plaintiff had his interview with the case manager assigned to his file. Upon completion of the investigation, the Plaintiff received his Right to Sue Letter on October 20, 2020, a copy of which is attached hereto as Exhibit "G".

32. Post-filing of the EEOC Claim, the Defendant committed and continues to commit acts of retaliation towards him to harm the Plaintiff, financially, economically, emotionally, and psychologically, which are a direct violation of his civil rights.

33. After filing the EEOC complaint the Defendants increased their level of harassment and continued to respond in repeated, numerous and on-going acts of retaliation.

34. The Defendants have refused to pay final unpaid wages in the amount of $30K owed to the Plaintiff.

35. The Defendants refused to provide a copy of Plaintiff's HR/personnel file even after repeated written requests and its HR Department representative promised to forward, a copy of which is attached hereto also as a part of Exhibit "B".

36. The Defendants sent out an email to all its vendors, staff, clients, and interpreters defaming the Plaintiff and impairing his stellar reputation within the same community he continues to strive to work in, refer to Exhibit "C".

37. The Defendants provided stellar recommendations of the Plaintiff and his work at the Company, copies of which is attached hereto also as a part of Exhibit "H". Then when the Plaintiff resigned and asked for the monies owed him, they turned on him and the Defendants began to defame the Plaintiff by spreading vicious rumors that he was a fraud and was fired and did not resign.

38. The Defendants began to defame the Plaintiff's stellar reputation in the company and within the broader interpreting/Deaf Community that he was a "dangerous man in crisis and mentally unstable", even though throughout the Plaintiff's employ at the Defendant's company, the owner, Angela Roth repeatedly referred to the Plaintiff as "a gentle giant who couldn't harm a fly". The Plaintiff's personnel file was full of praise.

39. After the Plaintiff filed a Cease & Desist Order for the Defendant to stop spreading defamatory and slanderous untrue rumors about, not only did the Defendant ignore the Cease & Desist Order, but turned around and filed a Restraining Order with the Osceola County Sheriff's Department in further retaliation to further build a false narrative against the Plaintiff.

40. The Defendant then interfered with his new business partnership, JA Interpreting Services, LLC, a competitor of the Defendant's by threatening the other partners to part ways with the Plaintiff, or face litigation. The Plaintiff's partners believed the lies told to them by the Defendants and feared the threat of litigation and voted the Plaintiff out of the partnership, of which, the Plaintiff was a 20% profit-sharing member, a copy of which is attached hereto also as a part of Exhibit "I".

41. As a result of paragraph 41 above, the Plaintiff was immediately unemployed and stripped of his business and ownership interest of a company that he had built to begin grossing $1M annually. Not only was the Plaintiff the lifeblood of the partnership, but since being removed against his will by majority vote of majority shareholders, that company has since gone out of business due to his absence.

42. After being forcefully moved from partnership, the Plaintiff took on a consulting job with another competitor of the Defendant's, King Interpreting Services, LLC.

43. In further retaliation, soon after, the Defendants filed fictitious lawsuits against the Plaintiff, his new employer, and the CFO of the company.

44. The Defendants' drove the Plaintiff into bankruptcy through fictitious filings, claims and allegations brought against the Plaintiff, stating he is a fraud without providing any proof of such egregious and slanderous claims.

45. To further retaliate against the Plaintiff, the Defendants have continued to harass the Plaintiff and his family, by alleging that the Plaintiff is an owner of the company he is a hired consultant of, King Interpreting Services, LLC, and has worked to convince the trustee of the US Bankruptcy Court of the Defendant's alleged claim that the Plaintiff owns a part of the company he currently consults for, which is a false claim on its face, a copy of which is attached hereto also as a part of Exhibit "J".

46. The Plaintiff continues to be harassed by the Defendants by purposely making false claims about the Plaintiff owning King Interpreting Services, LLC, a Florida limited liability company that is solely owned by managing member, Janet King, of Orlando, FL.

47. The Defendants' continued harassment and retaliation has had the Plaintiff and his wife, Tamara Ignatowski inside the bankruptcy system for more than three years, when the discharge of the bankruptcy estate should have been concluded two or more years ago as the Defendants were the only creditor to show up to the bankruptcy hearings.

48. The Defendants retaliated by illegally terminating a close friend of the Plaintiff's who was working for the Defendants post-resignation of the Plaintiff. The Defendants willfully terminated this friend of the Plaintiff's purely because he was a friend of the Plaintiff's. The Defendants did this as a vile act of retaliation against the Plaintiff. This employee was illegally terminated while he was still on FMLA approved leave from the Defendants' organization.

49. The Defendants' deliberate acts of retaliation and harassment has financially harmed the Plaintiff and his family as they have had to incur ongoing legal representation and court costs, to prove that the Plaintiff doesn't own a company that he doesn't own.

50. The Defendants continue to violate the Plaintiff's civil rights and have made demands that he no longer work in the industry where he has become a leader and influencer, and additionally, that the Plaintiff not even be able to work at all here in the State of Florida.

51. Roth personally reached out to a significant mutual client and slandered the Plaintiff and shortly thereafter, the client ceased using the services managed by Plaintiff at his employer, King Interpreting Services, LLC. The client called the Plaintiff to inform him that Roth called up and ranted for a while about how "evil you are and that you are a fraud and not to be trusted around money and then sent me a five-mile long email stating why our institution should not be working with you."

52. Roth personally had her scheduling team inform their Deaf and Hard of Hearing consumers to launch erroneous complaints against the Plaintiff's new employer, as to continue to harass the Plaintiff in his new role at his current employer.

53. As of the date of this filing, to the best of the Plaintiff's knowledge, the Defendants have not filed a formal dispute to the Plaintiff's formal EEOC complaint in a timely manner.

## CLAIMS FOR RELIEF

### COUNT 1:
### EEOC COMPLAINT FOR VARIOUS DISCRIMINATORY ACTS

54. Plaintiff re-alleges and incorporates all prior allegations in this Complaint as if fully set forth here.

55. The alleged actions are brought pursuant to Title VII of the Civil Rights Act of 1964, as amended. The jurisdiction of this Court is invoked by the plaintiffs pursuant to 28 U.S.C. §§ 1331, 1343(4) and 28 U.S.C. §§ 2201 and 2202. This lawsuit is brought pursuant to the "The Civil Rights Act of 1866," 42 U.S.C. § 1981, and 1981a and The Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by the Civil Rights Act of 1991. Equitable and other relief is sought under 42 U.S.C. 2000e-5(g).

56. The Defendant's organization had more than 100 employees at the time of the Plaintiff filing his EEOC claim.

57. The Plaintiff has filed all complaints and charges within the allowed statute of limitations of the EEOC.

58. The Defendants' actions, as described above, have caused Plaintiff economic and non-economic damages in the amount of $100,000, the maximum cap for EEOC claims.

59. The Plaintiff seeks the Defendants to remedy all unpaid wages, plus statutory interest in excess of $30,000.

### COUNT 2:
### RETALIATION TO PLAINTIFF'S EEOC COMPLAINT

60. Plaintiff re-alleges and incorporates all prior allegations in this Complaint as if fully set forth here.

61. Plaintiff has endured much harm since leaving the employ of the Defendants and although he has just wanted to be left alone and unpaid sums remedied by Defendants, the Defendants, especially Roth, has venomously retaliated and continuously sought to financially, economically, and psychologically destroy the Plaintiff.

62. The EEO laws prohibit punishing job applicants or employees (current or former) for asserting their rights to be free from employment discrimination including harassment. Asserting these EEO rights is called "protected activity," and it can take many forms.

63. It is unlawful to retaliate as an employer when an employee files an EEOC Complaint. Retaliation takes many forms including, but not limited to: it could be retaliation if an employer acts because of the employee's EEO activity to: engaging in verbal or physical abuse; threatening to make, or actually making reports to authorities (such as reporting immigration status or contacting the police); spreading false rumors, treating a family member negatively (for example, cancel a contract with the person's spouse); increased scrutiny; or making the person's work more difficult (for example, punishing an employee for an EEO complaint by purposefully changing his work schedule to conflict with family responsibilities).

64. Award compensatory for race, sex discrimination, retaliatory discharge, harassment, hostile work environment, numerous acts of venomous retaliation.

65. Award costs and reasonable attorney fees.

66. Grant any and all appropriate relief, which the Court deems necessary and appropriate.

67. Defendant's actions, as described above, have caused Plaintiff economic and non-economic damages in the amount of $5,000,000.

## PRAYER FOR RELIEF

68. WHEREFORE, Plaintiff requests the following relief:

    -A money award judgment entered against Defendant for $5,130,000.

    -An award of post-judgment interest on any money damages awarded at the current statutory rate.

    -Plaintiff's reasonable costs and disbursements for bringing this action.

    -The Court to impose sanctions against the Defendants in accordance with Federal Rule of Civil Procedure 11, which prohibits anyone from bringing a claim that is clearly frivolous or meant to harass someone, as the Defendants have utilized the judicial system to continuously harass the Plaintiff.

    -Any and all other relief the Court deems just and reasonable under the circumstances.

69. Under penalties of perjury, I declare that I have read the foregoing, and the facts alleged therein are true and correct to the best of my knowledge and belief.

Respectfully submitted on: January 19, 2021

By: _____
Julian M. Ignatowski, Sr.
Plaintiff, pro se
52 Riley Road, # 196
Celebration, FL 34747
(203) 502-3878
yourtaxguy@live.com